as Secretary of Health and Human Services, Ms. Blatt for the Abalance, Ms. Dixon for the Appellee. Thank you, and may it please the Court, my name is Lisa Blatt and I represent the hospitals challenging the agency's price disclosure rule, which absent this Court's intervention will go into effect on January 1, 2020. Hospitals wholeheartedly agree that patients should know their out-of-pocket costs for receiving health care, but this rule does not achieve that objective and is also invalid. First, the statute forecloses the agency's interpretation, and second, the rule violates both the First Amendment and the APA because the rule is unworkable, it requires hospitals to misinform their patients, and the rule grossly misapprehended compliance burdens. If I could start with the statute. A requirement for hospitals to list their standard charges for items and services unambiguously refers to the gross charges that appear on hospitals' chargemasters. Those are the only default asking prices that universally apply to all payers. This was such an obvious conclusion that the agencies in 2004 went through a rulemaking taking it for granted that the statute referred to the gross charges. Isn't your position on appeal, Ms. Blatt, I thought you conceded on appeal that this is ambiguous. In the district court, you argued it was clear, but isn't your position here that it's ambiguous? Don't you concede that? No. I think in a couple places in the brief, we say it's unambiguously refers to the gross charges. Now, the key thing, though, which is I definitely agree the emphasis on the appellate brief is that the interpretation fails step two, but I do think it's important that the step I'm sorry. My internet is spotty. Could you just repeat what you just said? Of course. So the brief makes two arguments, both that the statute is unambiguous and that even assuming there's ambiguity, the rule would fail step two. And I was just saying, I think the step one arguments are important because they certainly do go a long way in undermining the agency's interpretation under step two. And it's again, whether it's What do you do with the second phrase, the including phrase in the statute? Because the government says, look, including, it says standard charges include charges for DRGs. So by definition, plain language of the statute, standard charges are not limited to gross charges. Right? So standard charges for items and services are limited to gross charges. And the including phrase is not being used illustrative here because by definition, and the government concedes this, charges for DRGs are not by definition charges for items and services. So this language, the including language is in here because the items and service language would otherwise exclude it. And so the government tries to use that including to say that you can interpret the statute to mean payer specific negotiated rates, but that is incredibly implausible that the Congress would refer. I don't think grammatically, I don't think grammatically that's the way the sentence works. It says, the way to read this sentence is a list of the hospital's standard charges, dot, dot, dot, including four diagnosis related groups. The four before DRGs tells us we're talking about charges. Sure. I think that's fair. I think though what the statute is doing, because again, we know by definition that it's not an items and services, but I think here's, let me get to the more fundamental problem with the government's reading. The government may get you somewhere in saying that that injects ambiguity, although we don't think it does. But if you go there and say it's ambiguous, it doesn't allow the secretary to go to all payer specific negotiated rates and here's why. That reference is referring to a non-negotiable preset DRG rate by Medicare. And what the government tries to say is, well, that creates an ambiguity that allows us to get to all negotiated rates, not just the ones that aren't negotiated, for all private payers and rates that have nothing to do with DRGs. And so I don't think that helps them. But if I could also get to- Well, but it says, the word is including. It doesn't say only. It doesn't say the standard doesn't, the statute doesn't say each hospital doesn't say a list of the hospital's standard charges for items and services provided by the hospital and for diagnosis. It says including. So obviously, it's a broader category. Well, the example we give in our brief is you can- Standard charges is broader than- Right? I'm just looking at the language of the statute. Sure. And the example we give in our brief is that you could have a language of a statute that says states include Puerto Rico. And that is, you use the word including, and it's not being used illustratively. It's just doing a contraindication to what the statute might otherwise say. The problem with the, even if you think that there's some ambiguity in there, there's still Three problems with trying to say that a standard charge means all payer-specific negotiated charge, because a standard charge still requires some representative charge. And each and every individually and specifically negotiated rate, by definition, is not representative. It's bespoke, it's customized, it's the unordinary and the customized rate. It's just not representative or common or ordinary. And second, there's no question that this statute requires disclosure of knowable numbers. You have to know the number in order to disclose it. And many negotiated rates just don't have knowable numbers. They rather depend on complex algorithms that would vary depending on patient care. And that's simply a problem that the Department of Justice never addresses. And the third problem with this, and I think this goes back to the step one argument, is that this is an unprecedented disclosure regime. It really is. And it's implausible that Congress intended this provision of the Affordable Care Act to usher in a sea change in industry practice without anyone noticing until 2019. The agency went through two rulemakings, one in 2014, and one in 2019. Can I go back to your statutory question for just a minute? Under your theory, if this were limited to gross charges, am I right that that would result in disclosing charges for only about 10% of patients? Is that right? So, there's no question that... Is that right? Is that right? So, you're right that patients do not largely pay gross charges because most patients are covered under Medicare or insurance. What is also correct is that the statute isn't directed to what patients pay because hospitals would never know that. So, there's no question the statute can't be talking about patients' out-of-pocket costs because hospitals, of course, don't have the patient-specific information. My only point... Right, so it won't cover, under the government's theory, under the government's regulation, it won't include everybody, but it will include a lot more than just 10%. My reason for asking the question is, isn't it perfectly reasonable for the government to interpret this statute in such a way that it promotes the maximum amount of... No, it doesn't tell anybody anything. So, we can get to that under the APA, but in addition to... I mean, we could talk about it, but just on the negotiated rates, it really tells no one anything. But the one thing we know is it doesn't tell consumers. This is supposed to be just directed to what hospitals can disclose. The rate has to, again, be knowable. And many rates are unknowable. So, already, you have an incomplete database, and the government's rule just doesn't address it. It doesn't speak to it. You have no clue what the government thinks about it unless you hear a post-hoc representation for the first time in the response brief, because the rule doesn't address this. The rule also is completely silent to all rates that aren't itemized. So, many rates appear only as a package or a bundle. Again, the rule is completely silent. The agency was inundated with comment after comment saying this is how rates work. Negotiated rates don't come in these unique... I mean, itemized way that the government envisioned in the rule. Rule doesn't speak to it in the final rule. The government's brief is completely silent on the first problem, although it addresses the second problem in a way that creates more questions than it answers. And I can... I want to... Finish. I'm sorry. Sure. I mean, this is devastating to their whole entire justification, is whatever they say is, aren't we doing something? Well, how would you know? Because the agency has never told you how this rule is even workable or could provide any consumer any information if the database is both incomplete and misleading. Now, in the government's brief, for the first time, it says, hey, hospitals, if you have itemized or bundled services like a hip replacement, just put NA for not applicable in the database. So the hospitals heard that for the first time. They still don't have any way of knowing what to do about rates that turn on patient care. So they have no clue. But they say put NA. So there are two problems with that. First, that is very misleading because it indicates to consumers that the item is not covered on the insurance plan, which turns the purpose of the rule upside down. And second, the agency still has to grapple with the problem. You can't make this up in your opinion, and the government can't get up here in the first time and try to explain how the rule is workable when hospitals have never been told and have never had the opportunity to comment. Actually, they commented, and then the agency just ignored the comments. But I could also talk about the fundamental argument about what you were saying, Judge Fadel, that they could at least know something because they could look at, for high deductible plans, they could at least determine, assuming incorrectly that you would know something about negotiated rate, they could at least look at what's called the discounted cash price. So our argument under both the First Amendment and the APA, this is a very, very serious problem for the government. The rule recognizes it requires a discounted cash price. That's one of the five definitions of standard charges. The rule recognizes that many hospitals just don't have a standardized cash discount. They rather have individual discounts based on sliding scale for financial need and individual charity care and bill forgiveness. Now, what this rule does is it tells hospitals to falsely, falsely report that their discounted cash price is the undiscounted gross price for the service. Now, that perniciously says to uninsured patients that the only way they can get healthcare is to pay a gross price which the government is gonna get up here and tell you and what Judge Stadel, you just indicated, is some inflated price that no one pays. So that is just pernicious and it's perverse. Now, the government's, HHS doesn't dispute this in the rule and you know why? Because they don't address it. They're just silent as to this serious problem, even being told by hospitals that it would deter patients from seeking care. Now, the government's brief tries to rehabilitate the rule by citing to a different statement. I think it's page 547 of the rule that is addressing a different problem of misrepresentation as to confusing patients with just, you know, the document data about the negotiated rate. And that part of the rule on 547 says, hey, nothing stops the hospitals from issuing corrective statements through patient counseling. Well, the problem with that is that they block you from putting a corrective statement in the only place that would make sense where you're making the misleading statement. So when you have to post gross price for your discounted cash price, when you in fact have discounts, it's in a spreadsheet. So it's machine readable and you can't put any disclaimers or long text explanations. So you have this very misleading statement saying discounted price equals inflated gross price. That's wrong. And then you have the problem of all the negotiated rates being either proliferated with NAs or just no one knows, still knows what to do. And... Can I ask a question? Oh, sure. Yeah. So I really want to go back again to this statutory text and to the charge masters. Now, when it says each hospital shall make public a list of the hospital's standard charges, are those... Previously, those were the charge master charges, right? So just let me just clear up a little bit. So they're the gross charges and charge master is... When you say gross, you are required to list the charge master list. Is that right? Yeah. So the gross prices are what the charge masters contain. So those are list prices. Okay. And the maximum... I got it. And those are, in your view, standard charges. Is that right? Yes, which was what the Obama administration said. I don't need a modification of this. All I need is... Yes. Your client believes those are standard charges. Is that right? Yes. Okay. Now, the decision below in the district court says the charge master rates are highly inflated, often bear little resemblance to the actual payment tendered to a hospital by a patient or a third-party provider. One study found on average insurers and patients paid hospitals only about 38% of the amounts on charge masters. Is that true? Those facts? Yeah, we don't dispute that. But here's what we do dispute. No, I'm not... Yeah, we don't dispute it. I don't want you to pivot. I don't want you to move to a different argument. Let me just pursue this argument first. Okay. And then I'm sure Judge Taylor will let you make whatever other arguments you want to make. So why wasn't that a violation of the First Amendment, a violation of the statute? If these are not charges that many people at all pay at all, and if in fact they contain false information, why do you think those are the appropriate kinds of charges under the statute? So they're not... First of all, they're not false because for time and memorial, and this is in the rule, that gross charges are the asking price that apply to all payers. So they anchor all negotiations and they are the maximum that fits to your First Amendment point. They are the maximum allowable cost that any patient... So if you've got a bullet wound or a bad car accident, that gross charge is the price... So a maximum charge would be regarded as a standard charge? The maximum it gets to your First Amendment point. The standard is what it gets to the universality of it. So no, we're not defining standard as maximum. I thought you were asking why the gross part... I'm asking both questions. I want to know why the gross charges are standard under the statute and why they are not in violation of the First Amendment on your argument that they are misleading. Let's take just the statutory argument. Our definition of standard is modeled, default, universality, and representative. The only representative charge, the only universal charge, is the charge master charge, not only because it's the maximum, because it anchors all insurance negotiations. So it shows you that if nothing happens in the absence of anyone uttering anything, the hospital is asking for the list price. So it is like your standard rack rates or the MSRP or a hotel room rate. It's the published advertised charge. So I think that that's why... And if I could just explain, I think it gives... This is why I do think it's important as a common sense matter that the 2014... The government's response to that is that's not the way the hospital business operates. I agree. There isn't one price. It's completely different. And to use menus or hotel rates as a model is to miss entirely the way this industry operates. Yes, and I'm going to get to this point again by the whole 10-year history of interpretation. What the government has said throughout the 2014 rulemaking and the 2018 rulemaking and this rulemaking is here's why a disclosure regime that requires gross charge disclosure is so great. So what the government tells you in the rule, I think it's at 540, is that disclosures of gross rates promotes price competition and brings down the cost of patient healthcare. And here's why. Because it tells the uninsured patient its maximum allowable price and it allows insured patients to comparison shop because the starting price is at least somewhat proportional to the ending price. So you can look at two different hospitals and see that one has a really high gross charge starting asking price and the other one isn't. But whatever you think of the word standard, the government has no definition of standard charge that doesn't include any price. Any charge is a standard charge in their view because standard means specific and charge is not limited to the government's asking price. So there is no such thing and you can say it's a unique market, but you still have to define standard and charge and it can't mean everything, particularly when the numbers were unknowable. If I could just get back to the First Amendment and just why isn't this misleading? Again, I think that there is some common sense element to the fact that two administrations thought that this meant the charge masters and that's what hospitals were doing shortly after the passage of the Affordable Care Act. And the agency went through two rulemakings. And when the agency went through its second rulemaking in 2018, it never said, hey, we're proposing negotiated rates. It said maybe standard, would everybody like to comment whether standard could mean average or median? So this wasn't even raised as a possibility either in the 2014 or the 2018. Now, why it doesn't violate the First Amendment? Which is a wonderful question. I do think that it passes any level of scrutiny that when you have a buyer-seller reaction, the government is allowed to prevent the following scenario. You can buy my house, but I'm not going to tell you the price. And then you say, okay, and then you list the price. So it's always okay for the government to compel you as part of offering a service in a transaction that if you accept, here's the maximum price you would pay. And so I just think that's been a given in First Amendment. What do you mean if you, I'm not clear. What do you mean if you accept? I understood that you had to list the charge master charges, isn't that right? Not just tell a patient after the patient is accepted. They have to list them, right? Right, so what I'm saying is that list, just like any list of any pricing, communicates that if nothing else happens, in absence of any other circumstance, that's the price you will be charged. Is that what it says, those qualifications that you just gave? Are all those qualifications on the list? Or is it just the charge master list? So a charge master list is not something that had been published before. So this was never, this was a big deal when the government in 2014 said, you got to do this. So it did not come out until 2014. And these charge master rates were known to insurance companies, but this was why the government, including today, wanted to get this information out there because it would at least communicate to patients what their maximum allowable charge is. But the caveats, the explanations, which you said don't... Oh, about the discounted? No, no, no. In order to not be misleading, that is, in order for the patients to not think they're actually going to have to pay the charge master rate, there has to be some explanation with it that says this is the gross charge. Otherwise, it's going to be misleading, right? This is the gross charge which may be reduced under certain circumstances or whatever, right? And I think that's a problem that the government should have addressed. Now, I think... Hold on a second. So with respect to the charge master list, which you think is okay, is there a bunch of caveats that explain to the patient what it means? No, but it's... Remember, the statute is not directed at patients. This is a list... That's what I thought you were going to say, and therefore I want to know why you think that. So it says a list...  Well, what's the point of the make public a list if the list is only going to insurance companies? So I think what... And this is, I think, a point we were trying to make in the 28-J letter. The government acknowledges that customers aren't going to read this list, that it's only being done as a computer spreadsheet database in the hopes that some hypothetical third-party vendor may surface that will then turn this into apps. So this entire list that we're talking about with the discounted cash price and all the negotiated rates by plan, by location, by inpatient, outpatient, is all in a machine-readable spreadsheet. No, I understand that, too. I'm still... I hate to say this. I'm stuck on the statute, okay? So, you know, I'm a bit real textualist here. I'm trying to read the statute. What makes you think that the purpose of the statute was not to communicate information to consumers? Is there some legis... I mean, I would have thought when I saw this that this is an effort at transparency with patients. Maybe not a good effort, maybe not a perfect effort, maybe not even a constitutional effort. But I'm first looking at what the statutory point here is. What is the reason for this section? If I look only at the text and it says public, I think that means to tell the public. And what the government said, and we don't disagree with... What do you think is the answer to this question? Oh, I think absolutely I agree with the government, is that it allows me to comparison shop. If I see $10 billion for colonoscopy and I see $1 million for colonoscopy, I'm going to go to the $1 million. Okay, so it is information to the consumer. I thought you... The reason I broke in was you were telling me that it's not information for the consumer. The statute is intended for the consumer, is that right? So the statute is intended for the public, which would include the consumers. Let me be very clear on this. The hospitals... What I'm saying with the statute is completely directed at is only information the hospitals themselves can disclose, which the hospitals can't disclose out-of-pocket costs. That is a very minor point. So it gets at the point that no one actually pays. And our point is that the statute can't be directed at what people pay because the hospitals will never know that. They don't even know what insurance companies will actually pay, which the government can see, because the actual payment at the end of the day is going to turn on variables about patient care. All right, I understand. I got it. In terms of a First Amendment analysis, it is perfectly appropriate for me to stand up here and read to you what the government has said across two administrations, which is a good purpose for the disclosure of the chargemaster, that it serves a public purpose. And I not only personally agree with it, the hospitals agree with it, but it's a fair point as a First Amendment matter and as a textual matter that no one has disputed that gross charges absolutely means, excuse me, standard charges absolutely includes gross charges. And that's also in the final rule. Okay, I got it. I got it. I appreciate it. The one thing, though... Sure. Would you have one more thing to say in response to Judge Garland before I ask you an unrelated question? Let's go with unrelated, but I do think, though, I do think that this just segues into the two-list problem, but let's go with where you are. Well, no, why don't we talk about this two-list, since you want to talk about that? And I just have a factual question for you, just a fact question, which is... So, is the... There's two lists, right? There's this shoppable services list and the comprehensive machine-readable list, right? Those are the two lists. And you say, the statute says a list can't be two. Is... This is just a fact question. Is... Is there anything on the shoppable services list that isn't on the comprehensive machine-readable list? In other words, is a shoppable list just a subset of a comprehensive machine-readable list? So, it is a subset in the sense that... I'm going to answer in the same sentence that a sentence is a subset of the alphabet, and a recipe is a subset of a grocery list. So, you have... Well, how about... Can we put it in terms of... Is it a subset in the same way that an airline's rates for... That Coach is a subset... For an airline offering service from Washington to San Francisco, is... They have three or four different rates. Coach is a subset of those rates, correct? Yes. Yes, but if I could just answer the question, this list would say this is a customized thing that the travel agency does. It throws in your hotels, your cars, and maybe some Disney World and trips to look at SeaWorld. So, what's the... The shoppable... So, the machine-readable spreadsheet is a raw data dump. It's just a raw data dump in Excel. It's very critical to understand that it's not just you take 300 items and move them over. You have to use judgment. And it would be... Let me just get this out. It's different formats with different information to different audiences for different purposes. The different information, which I think your question goes to, is that vaginal delivery or a sleep study or some very complicated things with or without comorbidity may not be... The way it's described on the shoppable service list doesn't necessarily transform into a straight raw data. Now, it might because a straightforward thing like psychotherapy may have, you know, a machine-readable counterpart. But the critical part is once you get to the shoppable service list, which is this consumer-friendly... And every hospital on its own, minus the 70, gets to pick any shoppable services that you would dream up ahead of time that you might schedule in advance. So it's like, oh, well, let me think about how I might need hospital care. And that's not the way the items and services in the DRG list works. So in that sense, I think a sentence, making a word out of the alphabet or using a recipe, because you have the ingredients on your grocery list. But somebody with some intelligence has to figure out how to put all those ingredients together. And there's no limit on how you describe your shoppable service. You can describe... I think the government had like, I don't know, 17 references to ancillary services with stuff I've never heard of. And it said mix and match, not exhaustive. Just do what you think might be helpful for consumers. And so I think in the government's view that that's just two lists. It has to be. Because there's really no other meaning for two lists. Now, so I think that's my best answer for you on the information in the subset. All right. I have a question about your... I guess it's both your APA and your First Amendment. On page 43 of your brief, you say that the agency failed to grapple with the reliance interests engendered by its previous rules. What are those reliance interests? Yeah. And I hope to make this as part of an Encino argument. But the reliance interest, I think, is a... Well, what is it? Yeah, just let me put it in the box of First Amendment because it's a better APA argument than the First Amendment. The First Amendment is grounded in much better arguments than the reliance interest. So on the reliance interest as an APA matter, it is that from the get-go, hospitals thought... The hospitals were just getting together their chargemasters. And in terms of that everyone agrees, the hospitals are wholeheartedly behind transparency, that they invested on a lot of time, money, and expense in two ways of getting this information to consumers. One is the price calculator tool. That's the alternative way of complying with the shoppable service list. So that helps. It's much more directly related to the problem. They sit down with you and you input your data and it tries to give you, based on your plan, the information. And the second, which I think you might have had, is a one-on-one counseling session where they sit down with you and say, what's your insurance? Here's how it's going to work. What's your deductible? They try to figure it out. And that is an investment. So this is a new regime. And this is where the government really messed up. The government's rule prolifically says, this is just no big whoop. This information is readily available on your rate sheets and you're already doing it for state. So just put that information out there. You only need 30 days, maybe 60 days to do it. It'll only cost you $1,000. That was preposterous. So what the government, in its final rule, raised that to $11,000. And the government will tell you they based it on a hospital's organization, which the rule cites. The rule cites that hospital organization's estimate. But then the rule prolifically doubles down on, to justify the amount, that this information was at your fingertips and you're already doing it under state. Now, those are manifestly false and the government's never contested it. And here's why. No statute requires this kind of disclosure. They're all based on retrospective data information where you then know the rates and then you can sort of calculate it. And the second thing is, hospital applications. I mean, all new regulations, many new regulations, require substantial additional investment by regulated parties. And here, the government seems to have been aware of that. I mean, maybe not as much as you thought, but it did increase dramatically the amount that it thought complying would cost and it extended it for a year. And it excluded hospitals that already have a tool that works. So what did it do that it should have done? So there's a couple of misassumptions there. The machine readable spreadsheet is an absolute requirement. Therein lies the Herculean burden of negotiated rates, which don't exist in many instances at all on a knowable number. Second, many of them exist not itemized. So there is no way to put any information in that spreadsheet. Third of all, there's still a burden problem, because even if there's a knowable rate, there's an actual itemized rate, hospitals don't have the information. They have to manually reverse engineer it with clinicians, legal staff, and poring through contracts and trying to figure out how this would work for up to 6,000 different permutations. So to say that they upped the number, but then I counted seven times that they mistakenly said, you're allowed to burden someone, but heaven help, but the APA at least requires the agency to at least understand the burden. I thought that they had to at least explain it and acknowledge it, but they misacknowledged it seven times. They seven times said it. Ms. Blatt, unless you're way over your time. Conceitedly, we were the ones that took you way over it. But unless either of my colleagues have questions at this point. Just one. Just one thing, Judge Taylor. I've been listening carefully. Ms. Blatt, as I'm hearing your argument, you seem to be saying something that would cause me to conclude that neither the charge master rate which you prefer, nor the government's present scheme is transparent. They're equally bad in terms of what they communicate. So I'm not, I can be very honest with you in saying I'm not buying your argument to the extent that you're making it that the charge master rate is discernibly more transparent than what the government is proposing. And especially when you say it's nothing more than a maximum, because in my mind, that means the hospital can tack any rate on the charge master rate because it's only a maximum. And we go down maybe, but you can say anything. I don't know how that serves the consumer. You're saying, well, the alternative approach doesn't either. But if I'm hearing you correctly, your principal objection has nothing to do with worrying about transparency. It's just that the government's approach is more burdensome on you and more expensive. Neither one is transparent. Hospitals don't like lying to their patients and this will require- If you're lying to the patients, as I heard, listened to your argument in suggesting that the charge master rate is a rate, it's not. And there's nothing that says, as I understand it, you can tell me if I'm wrong, that alerts the consumer when they see that charge master rate that beware because any and everything below this is possible. We do not want to suggest to you that this is the rate. Is that what you do? So, yes, in the sense of the hospitals have done the two things I've talked about and states have done a lot in this respect at the initiative of hospitals. And that is the price transparency tools that have been developed, hospital by hospital and state by state. But the answer to your question that both regimes aren't so hot is a vacature of the rule because the agency is not- No, no, no, I understand. I'm just trying to understand what you're arguing because the charge master rate as you prefer, certainly doesn't sound like a transparent approach. So, all I can say on that, again, and it's perfectly reasonable to take the government at its word that it may not be a perfect regime but that Congress rationally wanted this information out because the government concluded it would bring down patient care and cause price competition. Now, if you don't buy the government's rationale because in 2019, they thought that didn't go far enough, that's totally fair and that's totally rational but the statute didn't allow them to go this far. And with the three problems I talked about under the APA is that the workability problem that it forces in its leading statement and then it compels corrective speech to correct the speech you didn't want to make in the first place. And then third is just the burden problem. But the big problem is the workability problem. Whatever answer we're going to hear when she gets up is going to be new to me. Thank you. Okay, thank you. Thank you. We'll hear from the government and I'll give you a couple minutes for rebuttal. Okay? I apologize. Good morning. May it please the court. Courtney Dixon for the secretary. It's an unavoidable reality of the market for hospital care that hospitals have established different charges for the same items and services which they will usually and customarily apply depending on the category of paying patients. The agency here looked at the realities of the market for hospital care. It looked at the statutory text including the diagnosis-related groups clause and it looked at the problem Congress was seeking to solve in the statute specifically bringing down the cost of health care coverage. And from all of that, Your Honor, the agency interpreted standard charges to require hospitals to disclose three types of standard charges. There are gross charges which are the usual or customary price that might apply to self-pay patients. There are any standardized cash discount prices if the hospital has it which is the price that the hospital would offer to any cash-paying patient regardless of insurance status. And then there are payer-specific negotiated rates, the rates that they specifically contractually agreed with insurance companies to pay those insurance companies' beneficiaries and similarly situated persons, anyone with that particular insurance provider and likely a particular plan. If I have Blue Cross Blue Shield and I go to a hospital, the charges that will usually apply to me have been set in advance. They're contractually negotiated. And it's ignoring the realities of the market for hospital care, Your Honor, to say that in that circumstance the hospital is going to demand its chargemaster price. It's going to demand, again, the price that it negotiated with the insurer. And under the current status quo, it's not that these charges don't exist. They exist. They're driving insured patients out of pocket expenses. Patients don't learn of them prior to care. They learn of them when they receive an explanation of benefit forms weeks or months after the fact. At that point, the explanation of benefit form will say this is what the insurance company has negotiated and taken off. Their agency's rule, Your Honor, requires hospitals to disclose that information up front. And it concluded, based on the record before it, that consumers are going to benefit as a result, that they're going to be motivated to use this information. I mean, the evidence in the record shows, Your Honor, that consumers currently are casting about the right information and are so desperate for that information that they've taken it upon themselves to crowdsource the information that they find on their explanation of benefit forms, manually put them onto websites, and hopefully get some glimmer into these payer-specific negotiated rates that, again, under the rule, hospitals will have to disclose up front. I'm happy to address any of the... The payer, but for someone... I want to make sure I understand it. So if I need to go to the hospital to get my appendix taken out and say I have Blue Cross, the disclosure of the negotiated rates will help me compare hospitals in terms of what my out-of-pocket costs will be. Is that right? It depends, I think, Your Honor, on the particular insurance arrangement, so... Because do I care? Yes. Is that right? Yes. If I have to have my appendix out, I'll go see what... I'll look on this thing and I'll see, okay, my out-of-pocket expenses at Sibley Hospital are less than at Georgetown, so I'll go there. Is that how this works? I think Your Honor's maybe example of an appendectomy might be perhaps the wrong example, given that an appendectomy we don't normally think of as something that's shoppable that might require, you know, an immediate hospital visit. I see. Well, take, for example... Give me an example of one that... You mean like, say, a colonoscopy? Yes, Your Honor. That's the example that our brief uses that the agency refers to. Yes. Yeah. Right. But that's what I'll be looking for, right? I'll be comparing what it costs me out-of-pocket at Georgetown versus Sibley. Correct? Yes, Your Honor. And if you have Blue Cross Blue Shield a particular plan, under the agency's rules, you can look at Hospital A, Hospital B, you can look at the payer-specific negotiated rates for your provider and plan, and if you have a high-deductible health plan, the payer-specific negotiated rates that listed if you haven't met your deductible may very well be your out-of-pocket expense because you will likely bear the full financial responsibility without any cost sharing. If you have an insurance arrangement where you have a cost-sharing arrangement with your insurer, say the insurer pays 80% and you pay 20%, if you look at the payer-specific rates, you're going to have to do some math applying your insurance plan, so you might have to take 20% of the payer-specific rates. It might not be a perfect estimate of out-of-pocket expenses, but under the rule, you have a far better estimate of your out-of-pocket expenses than currently exists, in which, if you try to look at Hospital A and Hospital B, you're going to see charge-master rates, which likely bear a little to no resemblance  And, of course, under the agency's rule, you could compare payer-specific negotiated rates with any potential standardized cash discount prices, and you can compare the payer-specific negotiated rates and can determine whether it's cheaper to pay for your care directly in cash rather than go through your insurance at all. And, electives have suggested, Your Honor, that if a hospital doesn't have a standardized cash discount rate, which under the agency's rule means that it applies across the board to any patient, regardless of insurance status, as I noted earlier, who's going to pay for their care in cash, if a hospital hasn't established such a standardized cash discount price, it would report its charge-master price, and that's not misleading, because, of course, if you say, I want to pay for my care in cash, and there's no standardized cash discount price, the gross charge of the charge-master charge is the price the hospital would presumably come back with. Now, the idea that that disclosure of that rate would mean that someone would think there isn't individualized cash discount rates, I mean, I have two responses. First, of course, under the disclosure of just charge-master rates, there's no indication of cash prices at all, and so, it's unclear how that is any less misleading to consumers than saying a standardized cash discount price. At a minimum, under the rule, you can see a standardized cash discount price and know that cash discounts are a thing. Again, under the current status quo, patients are in the dark about these things prior to care. I'll also note, and the agency has remarked throughout its rulemaking that nothing in its rule prevents hospitals from providing additional information to consumers. The agency has lauded such efforts on behalf of hospitals. Hospitals are free to remark on their websites, to remark in patient interactions to say, you know, we don't have a standardized cash discount, but we offer individualized cash discounts in certain circumstances, or we offer sliding-scale cash discounts. Nothing prevents hospitals from doing that, and again, at a minimum, under the rule, consumers might know to ask those questions, and they don't currently know that under the current regime. So, again, based on the record before the agency, the agency reasonably concluded that this rule was going to meaningfully benefit consumers. The agency acknowledged that there are a lot of potential barriers that currently exist to allowing patients to perfectly shop for care in all circumstances. Some of those are inherent in hospital care itself. Your Honor mentioned appendectomies. Shopping for appendectomies might not ultimately be a thing. Hospital charges are also inherently complex, and some consumers might not be able to perfectly estimate their out-of-pocket expenses in all circumstances. The agency acknowledged this, but it nonetheless reasonably concluded that this rule was a necessary first step to start to bridge the significant gap that exists between consumers and hospital costs, Your Honor, in which, again, the record was very clear that consumers overwhelmingly desired the type of information that the rule requires hospitals to disclose, and that currently consumers are incredibly frustrated. I mean, the hospitals have noted, of course, sorry, I just had to No, you finish your sentence and then I'll ask your question. I was only going to remark briefly that the hospitals have noted their current efforts at one-on-one counseling or offering other services. Again, the agency lauded such voluntary efforts, but the evidence in the record before the agency was clear that consumers don't think that the current status quo is working for them, and, of course, hospital charges are not going down or at least certainly not as much as they could or should. And so the agency made accommodations to hospitals who are offering price transparency calculators already and they said you don't have to satisfy the shoppable services list which is trying to serve the same goals, but it's certainly not an answer to say that, well, some hospitals are doing this voluntarily because, again, the evidence before the agency was quite clear that consumers are very frustrated about the current status quo. And so what's your response to Ms. Blatt's argument about a list? She says the statute says a list that is one list. This requires two lists and she says in response to my question that it's just not true. It's just not accurate to say as you do in your brief that the shoppable list is just, I think you say in your brief, nearly another way of describing or portraying the data on the machine comprehensive machine readable list. What's your answer to that? Right. So under the rule of hospitals who have to establish a list of their items and services, standard charges for items and services, that's reflected in the comprehensive machine readable file, which puts all of this charge information in one place. Again, it's comprehensive for all the hospital's items and services. There's a separate display of charges for 300 shoppable services. The statute gives the secretary explicit discretion to specify how hospitals are to make public their list of standard charges. There was a question, your honor, about differences between the shoppable services list and the comprehensive machine readable file. All of the standard... Right. Is everything... Pardon me. Say that again. I'm sorry. I think I was going to perhaps anticipate your next question. Go ahead. Rather, there's a difference. Right. So all of the standard charge information that will appear in the shoppable services list is derived from the comprehensive machine readable file. Differences are that in the shoppable services list, there has to be a plain language description of the item or service. So in the comprehensive machine readable file, you can imagine a more complicated hospital jargon versus in the shoppable services list it's intended to be more consumer interfacing. There's also some differences in how the information has to be organized and presented because it needs to be organized by shoppable service and then including any ancillary services. So for example, to use the colonoscopy example, the hospital report a price for colonoscopy and then maybe in providing colonoscopy, the hospital also charges a facility fee. So the agency, or sorry, the hospital would list facility fee along with colonoscopy. Maybe the facility fee charge is already included in the colonoscopy charge  could note this is included. Maybe it's an additional fee in which they would provide the number of the fee or the amount of the fee. But the charge for the facility fee charge information there, Your Honor, is going to be the same information coming from the comprehensive list. It's just hospitals have to organize it in a more consumer friendly way and again, use plain language. All of which again is consistent with the secretary's explicit statutory discretion to specify how hospitals are to make their standard charges public. And yes, the agency gave hospitals fairly wide discretion in how they organize their shoppable services and how they list ancillary services. And that's because the agency recognized that hospitals have a variety of ways of, you know, offering their services, grouping them together. Not all hospitals are going to charge the same kind of fees along with the service as others. So there's going to be differences here. But even knowing that those differences looking up hospital B, A, looking up hospital B, seeing that there are different ancillary services for a single procedure, that's providing information to the consumer. Because again, all of this stuff is still driving consumers out of pocket costs because consumers just don't learn about it prior to care. And the agency has decided in this rule that, you know, sunshine is the best medicine. And that, again, as the record evidence suggests, consumers are going to be motivated to use it and they'll benefit as a result. Can I ask you about the burden argument that Opposing Council made, which I take to be an arbitrary and capricious argument under the APA? So it seems like looking at their briefing at Area 5253, it seems like their argument is thousands of different negotiated rates and non-straightforward clients and that the hospitals calculate rate data by patient so they can't even readily identify the rates that you're asking   a last argument that it's all based on algorithms, which, you know, you'd have to reverse engineer to get the right information to get the right information to reverse engineer in order that they would have to reverse engineer in order to determine and so as a consequence one, I'm trying to remember what the words that were used there were two P's pernicious and another P and then the second that two adjectives describing it and then the second one being that that it costs way more than the government calculates. Right, so I guess there's a few things to unpack there and starting maybe with the cost argument the hospital estimate of 150 hours per hospital or approximately $11,000 to $12,000 150 hours was also the same burden estimate reached by Plaintiff's own amicus the Healthcare Financial Management Association There's no dispute about whether that's every year or just the first year the Healthcare Financial Management Association says in their amicus brief that they meant that only for the first year sorry and they meant that to continue for subsequent years versus the agency concluded I believe that in the second year and onwards it would be maybe $4,000 $3,000 lower but the agency's conclusion there is reasonable because you know a lot of the burden estimates that hospitals are talking about here is the burden of compiling this information in the first instance it's reasonable to conclude that once they've done so and they've built the infrastructure they've got the system they've got the list online that the burden is only going to diminish in subsequent years and again the fact that the agency reached the same first year burden estimate as the Healthcare Financial Management Association belies the assertion that the agency was off here by orders of magnitude and of course  its burden estimate quite significantly from its proposed rule the hospital's comments about burden did not fall on deaf ears again the agency delayed the effective database rule by a year it increased its estimate and it provided accommodations if you've got a consumer facing price estimator tool you don't have to compile the separate 300 shoppable services list the point of that display is to allow consumers to better engage with this pricing information in a consumer facing manner a price estimator tool is going to serve the same purposes and so the agency recognized hey if you've invested your time and resources in that it's getting at the same thing our rule is you don't have to comply with this separate list so yes the hospital's burden estimates weren't falling on deaf ears the agency accounted for them and the agency came to a reasonable conclusion about that estimate the agency of course parted ways with the hospital in the sense that the agency believes that the benefits of this rule outweigh those burdens but the point of this rule your honor is to attempt to shift some of the frustration that consumers currently face in that what about the second part of the argument that they really can't even do this that they calculate things by patient they can't identify the different rate groupings that they ordinarily build algorithms that cross reference each other and so they can't really translate this into the kind of formula that you want I think maybe there's also some misunderstandings about what does need to be disclosed under the rule as we explain in our brief if a hospital has negotiated with one insurer on a per x-ray basis then a column in the item and services list would be per x-ray and then you would note I've negotiated with Anthem $500 per x-ray if you haven't negotiated with other insurers per x-ray you would put not applicable in the other columns that's in the rule that charges have to be reported as applicable if you've instead negotiated with another insurer on a just a procedure basis or say the whole colonoscopy itself then you would say I've negotiated with Anthem $15,000 for a colonoscopy and you would say and you wouldn't need to necessarily separately say sorry I'm trying to describe this in a clear manner in that it's not that the hospital needs to reverse engineer from that colonoscopy package what a specific x-ray might cost in that package if it's negotiated per package then you report the negotiated rate for the service package if you haven't negotiated a specific for x-ray price with that insurer you don't have to report it and so there's it's hard to talk about this in the abstract the agency has of course put out guidance recently that it has some examples and charts along the same lines as I'm describing and I apologize if I'm if in any ways mucking this up but I just want to be clear that if a hospital hasn't negotiated a specific price for a specific item with a specific insurer they don't have to try and reverse engineer what could a price be for that they would say not applicable in that circumstance and they would report the package as they have negotiated it with the insurer and to the extent that hospitals might have to you know manually scour contracts or engage in other kinds of you know compiling efforts between how they do their billing systems again a part of this rule is that that's a feature and not a bug and that these rates exist they're contractually negotiated they drive patients expenses and they're reported after the fact in explanations of benefits forms and so it's not that you know under the under the current status quo it's not that they're not reporting these algorithms they all go away consumers bear them they're frustrated about them under the rule if hospitals have to sort through their billing requirements spend $12,000 up to you know to sort them out for a year then that's again that's a benefit of the rule and the agency reasonably concluded that that benefit serves the statute's goals it's going to benefit consumers and it outraged the burden on hospitals which again is going to diminish over time after this has been done in the first instance thank you um Judge Edwards Judge Garland any further questions no questions okay okay thank you uh Ms. Blatt you can have two minutes over other way Aaron come on there center me please and raise it okay good can you center me a little so I'm not okay well I can just lean down okay I'll take off my shoes no we're good I just took off my shoes okay uh thank you I'm gonna go um backwards because I'm gonna start where we left off so there are two separate problems the um workability problem the workability problem is separate from the burden problem and I told you I would hear for the first time what her answer to the workability problem was and I have to say I didn't understand it um the workability problem is this and the sites are in page 9 to 10 and 20 and the opening brief page 24 and 26 and the hospitals brief are the avalanche of comment sites that dictate this in total you will look for the rule and the rule will be silent on two problems that have nothing to do with burden they are incompatible the rule you cannot comply with it in the way the government thinks it is possible to communicate any relevant information on the algorithm that is not a burden problem the rate exists you don't know it until the patient showed up for care it could be on a volume discount if you come in and you ask the patient how much is it going to cost and whether it is doable at all it is not doable she did answer both parts I take your point to be that she is answering something that you didn't hear before and that she still hasn't told I still doesn't matter what she says the agency didn't speak to this at all the second thing the agency didn't speak to is the problem with the bundled  things are allowed and knowable in advance they don't exist in the machine spreadable way the rule requires a number you don't get to put a  on it and that is not a service offered the burden that is not I understand her point to be that means you don't have the number available not that the service is not offered not that you don't do x-rays but that you don't have a negotiated charge or that means the answer is not available not the service you think somebody would think if you put NA next to x-ray it means your hospital doesn't do x-rays remember this isn't a 250 million data entry on the burden point the burden is for rates that do exist there's a number out there the problem is you have to reverse engineer this has nothing to do with the algorithms or the bundle just to comply with the rule you have to reverse it give us an example instead of talking generalities give us an example so we can understand hospital billing works when the patient checks out you call adjudicate and that's the way the hospital billing system is set up the comments go through this in excruciating detail they can plug in after the fact plan A produces this what the contract doesn't tell you is what that rate was to start with there's not a rate sheet which the government kept saying just look at the rate sheets I don't know what you're talking about these are spelled out in contracts in text we would have to set up vendors consult with clinicians that's what the comment said the agency this is why the rule is so fatal instead of responding the agency said two misassumptions in addition to totally fair we picked whatever you're amici seven times they misstated this is no big deal they end with this from my own experience it's the only way I can understand this if you go to the emergency room doesn't cover everything at the end of the day you get a list of charges from the hospital you are charged x for x-ray y for visit c for lab test each particular kind of lab test different charge next column insurance company paid for are you saying first column charge for x-ray not how much insurance covers for it but charge for x-ray is not standard to people say even blue cross patients it's different for every single one recalculated somehow couple points that might be the rate applicable under that plan but to go figure out what that amount was it's not in a rate sheet you have to figure it out workability problem somebody had to figure it out after the fact I'm asking you did they figure out after the fact because of something about me so if judge Tatel went and got the same test he would get a different charge? He might get a different charge because this is why the comments do it. Severity is different. I'm asking about things like a lab test for x for coronavirus for example just to take an example which does not apply to me. Or a standard x-ray of whether you have a broken leg or not. Judge Tatel and I would not get a different column saying charge. I get a bill from the hospital it says charge. On the left it says x-ray. Next column it says charge. Next column how much the insurance company paid. Same plan, same inpatient,   location. I think this goes to judge Edwards claim. Judge Edwards raises a good point what do I do if I don't like what anyone says. What states have allowed is what states are doing with this problem. What states have asked for is after the fact adjudicated claims. Put that in the database. Why is that not doable? Why is it only after judge Garland leaves the hospital that they know how much to put on judge Garland x-ray charge. Two reasons. The x-ray charge might be billed on per item or volume discount and  know that in advance. It only happens if both of you have the same care. In advance I can't tell you what the x-ray price is. The statute requires itemized. It's an unknowable number. The second problem is I don't understand what you just said. Why is the price of the x-ray unknowable? It would have helped if the agency addressed it. Why don't you explain it to us. The volume discount is the easiest. If judge Garland got two x-rays it's one price. Judge Tatel only needed one x-ray. If you both got the same care you would know the amount after the fact but you didn't know the amount before the fact. Why? Wait a minute. We would know. The spreadsheet requires you to put in a price for an x-ray. I don't know it yet. If judge Garland needs two x-rays it's going to be $50. If we each need one x-ray it's $100. If I have one I'll get charged for $100. If he has two x-rays he'll get $200. Or more likely $5,000. I think the problem is you guys have figured out if the government wants to explain this in the final rule. It's silent on this. The rule assumes because we're not looking at after the fact patient care is irrelevant. But what the hospital said is their rate negotiation is not just a volume discount but if it's billed per item what are you supposed to put? It's a legitimate question. They did answer the question in the government's brief about if there's just an N applicable. The government has to explain how to do that. If you have the same statute but it was about standard car sale prices, would it be if the government   list your walk-in price, you have to list your preferred member price like triple A or something gets a discount, you have to list the corporate fleet price or at least the corporate fleet price you pay to Ford. Would each of those be standard prices or do you think there is no standard price in that circumstance? You can't have a subset of standard prices. You could have a standard price that is the median or average. I'm not sure. I'm not sure. Would you charge Ford, General Motors for their own fleets, I don't know, Hertz for its own fleet if it weren't bankrupt, the price that you charge triple A members in the old days had some kind of discount at a car sales place. Would those not be standard prices anymore? Two answers. No. No because the statute didn't say if they asked what is your standard price for this particular location, fine. You still have a problem with the government says it's not an asking price, it's the amount that everybody settled on. The government went off a cliff because it's every price. Any and all. I'm just trying to  hypothetical. It is a single location, just like it would be a single hospital. Don Buyer Volvo, which I've never been to. What is their price for this car to a triple A member? What is their price for this car to a corporate fleet? I was trying to say yes. If the statute poses the question your way. Not if it does it my way. If it does it exactly the way it is in this case. This adds the word with respect to any subpopulation. You are saying because they are using subpopulations that cannot be a standard charge under the statute. No matter if it's easy, clear, all the rest of your arguments are cherry on top. Even if everything was perfect and easy and no burden would not meet the statute. There are two layers. If you thought there was enough ambiguity you could add subcategories of patients. That is one way of looking at it. They are doing every single identified. The other problem is if they are right that everything specific is standard and charge is not limited to patients. I am giving you three categories in a hypothetical in a car dealership. Would that fit as a car dealers standard charges? For cars you have to do one price. If it says cars for the way your hypo was then you could have a standard asking price for each subsets. Yes. Yes. It is adding words that are not in there. Therefore it would not fit the statutory. It would be wrong under Chevron 1 or 2. I think it is wrong under 2. They are asking for every. It is one thing to say we will do it by standard and insurance and insured rate. Your hypo is for every walk in rate that is identified. My question is you go to this place and you are required and the rule says for each car it has to give the rate for corporate fleet, the rate if you are a triple A member and the rate if you are unaffiliated. Is that not an appropriate set of standard charges? For a statute that says what are your standard charges for cars, the answer is no. Even if you don't like that answer, it is not what the government did. It is not what the         answer.   is not what the government did. I am saying it is not an appropriate answer. I have no objection to that answer. Thank you.
judges: Tatel, Garland, Edwards